## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

GARY LYNN WARWICK
TERICA MICHELLE WARWICK

                Debtors

Case No. 3:24-bk-30884-SHB
Chapter 13

## MEMORANDUM ON
## <u>CONFIRMATION OF CHAPTER 13 PLAN</u>

**APPEARANCES:**    DEBRA L. MILLER, CHAPTER 13 TRUSTEE
        Debra L. Miller, Esq.
        Zachary S. Burroughs, Esq.
        314 Erin Drive
        Suite 201
        Knoxville, Tennessee  37919
        Attorney for Chapter 13 Trustee

        LAW OFFICES OF MAYER & NEWTON
        John P. Newton, Esq.
        Kevin S. Newton, Esq.
        Richard M. Mayer, Esq.
        8351 E. Walker Springs Lane
        Suite 100
        Knoxville, Tennessee  37923
        Attorneys for Debtors

**SUZANNE H. BAUKNIGHT**
**UNITED STATES BANKRUPTCY JUDGE**

This contested matter is before the Court on confirmation of Debtors' Chapter 13 Plan filed on May 24, 2024 [Doc. 2], and the Chapter 13 Trustee Objection to Confirmation filed by Debra L. Miller, Chapter 13 Trustee ("Trustee"), on October 2, 2024 [Doc. 43]. An evidentiary hearing was held January 8, 2025. The record before the Court consists of Joint Stipulations of Fact filed by the Trustee and Debtors on December 31, 2024 [Doc. 53 at pp. 2-6], twelve stipulated exhibits [Doc. 60[1]], and the testimony of Debtors at the evidentiary hearing.[2] This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

## I. FACTS

For seventeen years, Debtors have lived in their home in Powell, Tennessee, which has a fair market value of $310,000.00. [*See* Trial Ex. 1 at pp. 20, 30.] Debtor Gary Warwick is employed as a production manager with Coorstek, and Debtor Michelle Warwick[3] works as a cafeteria worker with Knox County Schools.[4] [Doc. 53 at ¶ 14; Trial Ex. 1 at p. 43.] In March 2023, Mr. Warwick received a gross annual bonus of $22,700.00, from which he received net proceeds of $15,969.45. [Doc. 53 at ¶ 18.] His 2024 annual bonus was $7,080.00, with net proceeds of $4,980.78. [*Id.*]

---

[1] As directed in the pretrial Order entered October 23, 2024 [Doc. 47 at ¶ 2.D], on December 31, 2024, the parties filed a Joint List of Exhibits and twelve exhibits [Doc. 54]. Because the initial filing contained information that should have been redacted under Federal Rule of Bankruptcy Procedure 9037(a), the parties submitted a replacement for the Joint List of Exhibits [Doc. 60] (notably, neither filing conformed to E.D. Tenn. LBR 9004-2(b)), with twelve exhibits. All twelve exhibits were admitted by agreement at the beginning of trial. Also as directed in the pretrial Order, the parties jointly submitted the trial exhibits in paper form. After trial, the Court discovered that the paper exhibits contained pages from the Capital Application Form with Bankers Healthcare Group (Trial Exhibit 6) that were missing from the electronically filed exhibits. Because the official trial record consists of the admitted paper exhibits and to avoid confusion, the Court will refer to each admitted exhibit as "Trial Ex. ___" with the appropriate page number of each paper exhibit.

[2] Additionally, under Federal Rule of Evidence 201, the Court takes judicial notice of all documents of record in Debtors' bankruptcy case, including the claims register.

[3] Debtors are individually referred to herein as either "Mr. Warwick" or "Mrs. Warwick."

[4] As of the petition date, Mr. Warwick had been employed by Coorstek for twenty-four years, and Mrs. Warwick had been employed by the school system for five years. [Doc. 53 at ¶ 14; Trial Ex. 1 at p. 43.]

Approximately seventeen months before Debtors filed their Chapter 13 petition on May 24, 2024, Mr. Warwick, as "Gary L. Warwick d/b/a Gary L. Warwick, Sole Proprietor," executed a Capital Application Form ("BHG Application") with Bankers Healthcare Group ("BHG") seeking a loan of $100,000.00 for "Business Development." [Doc. 53 at ¶ 12; Trial Ex. 6 at p. 1.]  The loan was approved for $75,000.00 plus a $750.00 "Doc Fee" to be repaid at 18.49% interest by monthly payments of $1,613.93.[5] [Trial Ex. 6 at pp. 2-3.]  Debtors provided an accounting to the Trustee, reflecting that they received $74,961.09 in net loan proceeds from BHG on January 4, 2023, which they used to pay the following debts:[6]  $28,470.65 to American Express; $2,036.20 on a Best Buy credit card; $3,789.00 on a Chase credit card; $1,000.00 on a different Chase credit card; and $39,000.00 to Wells Fargo.[7] [Doc. 53 at ¶ 13; Trial Ex. 7; Trial Ex. 8 at p. 1.]

In 2022, Debtors received $7,777.00 from a retirement account withdrawal, and in 2023, they received $8,290.00 from a second withdrawal, both of which withdrawals they used to pay outstanding debts. [Doc. 53 at ¶ 19; *see also* Trial Ex. 1 at p. 11.]  Also in 2023, Debtors refinanced their home mortgage with a loan of $229,600.00, from which they received cash totaling $65,375.11. [*See* Trial Ex. 8 at p. 6; Claim No. 3-1 at p. 5.]

---

[5] Although Trial Exhibit 6 did not include information about the term of the loan, amortization of $75,750.00 principal at 18.49% interest, payable at $1,613.93 per month, calculates to a payment term of 84 months.

[6] Mr. Warwick testified that he took out the BHG loan to pay off old credit card debts.  He also acknowledged that he had often taken out loans to pay off other debts but then incurred additional debt, requiring him to repeat the cycle.

[7] Although Debtors represented that they "paid off" a Wells Fargo loan of $39,000.00 [Doc. 53 at ¶ 13; Trial Ex. 7], Wells Fargo filed proofs of claim in this bankruptcy case for $224,496.00 relating to Debtor's home mortgage (for which the Note is dated May 17, 2023) and $4,316.17 on an "open-end revolving credit" account (which was opened July 14, 2016, and the last transaction for which was April 18, 2024). [Claim Nos. 3-1, 11-1.]

In addition to the funds received from BHG in January 2023 and their regular wages,[8] Debtors also deposited the following amounts into their First Horizon checking account xxxx6608 ("Account xxxx6608") from February 15, 2023, through June 12, 2024:

| RECEIVED FROM | DATES | AMOUNT |
|---|---|---|
| American Express | between February 15 and March 13, 2023 | $40,000.00 |
| Fidelity Investments | between April 13 and May 11, 2023 | $3,567.14 |
| Mortgage Connect LP mortgage refinance | between May 12 and June 12, 2023 | $65,375.11 |
| unknown source | between June 13 and July 12, 2023 | $683.89 |
| unknown source | between July 13 and August 10, 2023 | $2,458.02 |
| transfer Account xxxx2807[9] | between August 11 and September 13, 2023 | $4,000.00 |
| American Express | between September 14 and October 13, 2023 | $10,000.00 |
| Fidelity Investments | between November 14 and December 12, 2023 | $3,894.12 |
| Bank of America | between November 14 and December 12, 2023 | $9,400.00 |
| unknown source | between January 12 and February 13, 2024 | $4,500.00 |
| Internal Revenue Service (refund) | between February 14 and March 12, 2024 | $5,200.00 |
| transfer Account xxxx2807 | between March 13 and April 11, 2024 | $500.00 |
| transfer Account xxxx2807 | between April 12 and May 13, 2024 | $5,500.00 |
| transfer Account xxxx2807 | between May 14 and June 12, 2024 | $4,000.00 |

[Doc. 53 at ¶ 16; Trial Ex. 8 at pp. 3, 5-10, 12, 14-18; Trial Ex. 11 at pp. 2, 4, 6.]

From December 2022 through May 2024, the beginning and ending balances in Account xxxx6608 were as follows:

| DATES | BEGINNING BALANCE | TOTAL DEPOSITS[10] | ENDING BALANCE |
|---|---|---|---|
| Dec. 14 – Jan. 12 | $1,086.16 | $81,501.98 | $41,684.41 |
| Jan. 13 – Feb. 14 | $41,684.41 | $6,468.25 | $543.09 |
| Feb. 15 – Mar. 13 | $543.09 | $62,824.44 | $23,038.19 |
| Mar. 14 – Apr. 12 | $23,038.19 | $6,777.12 | $9,499.14 |
| Apr. 13 – May 11 | $9,499.14 | $12,370.03 | $4,219.93 |
| May 12 – June 12 | $4,219.93 | $71,857.66 | $38,151.47 |
| June 13 – July 12 | $38,151.47 | $6,396.04 | $17,515.96 |

---

[8] Mr. Warwick also received a net bonus of $15,969.46 between February 15 and March 23, 2023. [Trial Ex. 8 at p. 3.]  It, too, was deposited into Account xxxx6608. [*Id.*]

[9] Account xxxx2807 is a First Horizon savings account that Debtors hold jointly with their daughter. [*See* Trial Ex. 11.]  As reflected in the bank statements for March, April, and May 2024, Debtors transferred $13,000.00 from Account xxxx6608 to Account xxxx2807 in February and March but then transferred $12,500.00 back to Account xxxx6608 between March and May. [*Id.*]

[10] Total deposits include the amounts reflected above plus Debtors' wages.

| July 13 – Aug. 10 | $17,515.96 | $8,158.00 | $6,518.43 |
|---|---|---|---|
| Aug. 11 – Sept. 13 | $6,518.43 | $11,784.63 | $5,460.78 |
| Sept. 14 – Oct. 13 | $5,460.78 | $19,545.12 | $7,115.99 |
| Oct. 14 – Nov. 13 | $7,115.99 | $5,527.84 | $2,169.44 |
| Nov. 14 – Dec. 12 | $2,169.44 | $20,153.30 | $11,484.32 |
| Dec. 13 – Jan. 11 | $11,484.32 | $6,721.49 | $1,961.39 |
| Jan. 12 – Feb. 13 | $1,961.39 | $11,471.33 | $1,411.68 |
| Feb. 14 – Mar. 12 | $1,411.68 | $12,455.20 | $254.28 |
| Mar. 13 – Apr. 11 | $254.28 | $14,826.40 | $3,145.02 |
| Apr. 12 – May 13 | $3,145.02 | $11,902.41 | $446.42 |
| May 14 – June 12 | $446.42 | $11,271.13 | $1,918.23 |

In March 2021, Mr. Warwick had leased a 2021 Lexus MX300 ("Lexus") for thirty-six months, with a scheduled maturity date of March 14, 2024. [Doc. 53 at ¶ 10; Trial Ex. 5.] The purchase option for the Lexus at the end of the lease term (March 2024) was $23,076.90.[11] [*Id.*] Mrs. Warwick drove the Lexus. Mr. Warwick testified that he went to the Lexus dealership to discuss getting another vehicle, but the salesman "pressured" him to upgrade to a vehicle that would have cost $1,400.00 per month. He decided then to go to another dealership to trade in the Lexus and purchase a vehicle comparable to the Lexus so that Mrs. Warwick would have a vehicle similar "to what she was used to driving."

On January 6, 2024, sixty-eight days before the Lexus lease matured, Mr. Warwick executed a "Loan and Security Agreements and Disclosure Statement (Dealer Direct)" with Knoxville TVA Employees Credit Union ("Credit Union") for the purchase of a new 2024 BMW X3 SUV ("BMW") for $75,297.00 (paid by the trade-in of the Lexus for a credit of $2,669.00 and financing of $73,224.26[12] with the Credit Union at an 8.19% interest rate for a term of 98

---

[11] Mr. Warwick testified that the Lexus had approximately 36,000 miles on it in early 2024.

[12] Debtors stipulated that they financed $72,628.00 with the Credit Union, but the "Loan and Security Agreements and Disclosure Statement (Dealer Direct)" reflects an amount financed of $73,224.26. [*Compare* Doc. 53 at ¶ 8 *with* Trial Ex. 4 at p. 5.]

months[13]). [Doc. 53 at ¶¶ 8, 9; Trial Ex. 4 at p. 5.]  Payment in full under the BMW note totals $100,395.84. [Doc. 53 at ¶ 9; Trial Ex. 5 at p. 5.]  Debtors made monthly car payments of $1,045.79 to the Credit Union on February 15, March 13, April 12, and May 9. [Doc. 53 at ¶ 11; *see also* Trial Ex. 1 at p. 12[14].]

Before Debtors purchased the BMW, they were paying $3,389.20 in monthly installments on various debts (*i.e.*, $522.00 to the Credit Union on a 2019 Chevrolet Silverado ("Silverado"); $1,613.93 to BHG; and $1,253.27 to American Express). [Doc. 53 at ¶ 15.]  When Mr. Warwick purchased the BMW, Debtors also were responsible for their $1,594.75 monthly mortgage payment plus monthly credit card payments on balances owed to Citi, CBNA, Bank of America, Synchrony Bank, and Service Finance Company.[15] [*Id.*]

Debtors used credit cards extensively in the two years preceding the bankruptcy case. For example, they routinely paid for food and consumer services through a Disney Rewards Chase credit card ("Disney Card").[16] [*See* Trial Ex. 10.]  The Disney Card statements for January and February 2024 reflect that Debtors charged $12,381.81 and made payments (including any credits from vendors) totaling $5,439.78.[17] [*Id.*]  Mr. Warwick's Marriott Bonvoy Chase credit

---

[13] Notwithstanding the lengthy term for the BMW financing, the monthly payment for the BMW was $1,045.79 when the monthly lease payment on the Lexus was $418.78 [*See* Trial Ex. 4 at p. 5; Trial Ex. 5 at p. 1.]  Mr. Warwick testified that he could have purchased the Lexus at a price of $23,076.90 with payments of $491.00 per month.  Indeed, the Court takes judicial notice that the monthly payments for a principal of $23,076.90 at 10% interest for a term of 60 months would have been $490.32. *See* Fed. R. Evid. 201(b).

[14] As reflected in Debtors' Statement of Financial Affairs, in the ninety days preceding their bankruptcy case, they paid $4,700.00 to the Credit Union on the BMW and $4,800.00 to Wells Fargo Home Mortgage on their home. [Trial Ex. 1 at p. 12.]

[15] According to the proofs of claim filed in this case, Debtors last paid debt owing to (1) American Express in January 2024, (2) Wells Fargo in March 2024, (3) Chase for a credit card in March 2024, (4) Chase for the Disney Card in January 2024, (5) Synchrony for a Dick's charge card in January 2024, (6) Citibank for a Costco credit card in February 2024, (7) Barclays for a credit card in January 2024, (8) Bank of America for a credit card in February 2024, and (9) Citibank for a Best Buy credit card in March 2024.  [Claim Nos. 8-1, 12-1, 13-1, 14-1, 17-1, 15-1, 18-1.]

[16] As with many of the credit cards, the Disney Card was only in Mr. Warwick's name. [Trial Ex. 10.]

[17] With late charges and interest, the debt owed on the Disney Card as of the petition date was $9,470.28. [*See* Trial Ex. 10 at p. 27.]

card ("Marriott Card")[18] statement for March 2024 reflects a beginning balance of $0.00 and charges of $4,979.90 on a maximum credit line of $5,000.00. [Trial Ex. 9 at p. 1.]  Most of the March 2024 charges related to a trip to Orange Beach, Alabama and New Orleans, Louisiana.[19] [*Id.* at p. 2]  Debtors had made no payment on that debt as of May 1, 2024. [*Id.* at p. 3.]

On February 12, 2024, thirty-seven days after purchasing the BMW and three days before making the first payment on it to the Credit Union, Debtors first consulted with the law firm of Mayer & Newton through a thirty-minute phone call. [Doc. 53 at ¶ 11.]  Mr. Warwick testified that he contacted the firm a second time in April, with plans to file in May, and as reflected in their Statement of Financial Affairs, Debtors paid $24.00 for their prepetition credit counseling and $90.00 for their credit report on May 2, 2024.  [Trial Ex. 1 at pp. 13-14.]  Debtors completed their required prepetition credit counseling briefings on May 7, 2024. [*Id.* at pp. 8-9.]

Debtors filed the Voluntary Petition commencing this Chapter 13 bankruptcy case together with their statements and schedules on May 24, 2024. [Doc. 53 at ¶ 4; Trial Ex. 1.] Schedule I reflects a combined monthly income of $7,751.83,[20] and Schedule J reflects monthly

---

[18] Although the parties had stipulated that Mr. Warwick opened a Marriott Card account in March 2024 and that it had a $5,125.93 balance as of the petition date [Doc. 53 at ¶ 17], they orally stipulated at trial that the Marriott Card account was opened previously (perhaps as early as 2018), and as reflected in Claim No. 9-1 filed by Chase, the last purchase by Debtors was March 29, 2024.  Chase's proof of claim reflects that the last payment was August 2, 2023. [Claim No. 9-1.]

[19] On initial questioning at trial, Mr. Warwick testified that they had traveled in March to visit Mrs. Warwick's grandmother in a nursing home in Birmingham, Alabama.  Mrs. Warwick testified that the trip was planned because her father had informed her that her grandmother was nearing the end of her life.  She testified that they went to Orange Beach and New Orleans as a deviation after the visit to Birmingham and that the added locations were "not that out of the way."  Notably, the reservation for the Perdido Beach Resort in Orange Beach was made on March 5, ten days before the trip occurred, beginning on March 15. [*See* Trial Ex. 9 at p 2.]

[20] Mr. Warwick scheduled gross monthly income of $12,077.70, less payroll deductions totaling $5,279.72, for a net monthly take-home pay of $6,797.98. [Trial Ex. 1 at pp. 43-44.]  Mrs. Warwick scheduled gross monthly income of $1,125.83, less payroll deductions totaling $171.98, for a net monthly take-home pay of $953.85. [*Id.*]  Their Statement of Financial Affairs reflects gross income of $57,772.37 for Mr. Warwick and $5,164.08 for Mrs. Warwick for January 1 through the petition date. [*Id.* at p. 10.]

expenses of $5,801.75,[21] leaving monthly net income of $1,950.08. [Doc. 53 at ¶ 14; Trial Ex. 1 at pp. 43-46.]

On January 22, 2024, Debtors financed $5,886.00 for a family trip for the summer of 2024 to Munich, Germany, to celebrate Debtors' thirtieth wedding anniversary.  [Trial Ex. 1 at p. 38.]  Mr. Warwick testified that they financed the trip with Uplift before they had financial concerns.  He also testified that because they could not get a refund for the trip, they still traveled to Germany postpetition in June, spending approximately $2,000.00 from their savings during the week-long vacation for the three of them.

Through their Chapter 13 Plan, also filed on May 24, 2024, Debtors initially proposed to make biweekly payments of $900.00 for 60 months and to remit tax refunds over $1,500.00. [Trial Ex. 2 at pp. 1-2.]  Debtors propose as long-term debt obligations extending beyond the life of the plan their $1,594.75 monthly mortgage maintenance payment and the $1,045.18 monthly obligation to the Credit Union for the BMW. [*Id*. at p. 2.]  Debtors also propose to pay for the Silverado "in full" with 10% interest through monthly payments of $245.00. [*Id*. at p. 3.] Finally, the Plan provides for attorneys' fees of $4,500.00 and a pro rata distribution to nonpriority unsecured creditors. [*Id*. at p. 5.]

After the initial meeting of creditors was adjourned from July 11 to August 8, September 4, September 18, and finally to October 2 (when the Trustee concluded the meeting and filed her

---

[21] Schedule J reflects the following monthly expenses: mortgage ($1,594.75); home maintenance ($100.00); utilities ($200.00); water/sewer/garbage ($235.00); phones/internet/cable ($350.00); pest control ($25.00); security system ($25.00); food/housekeeping ($1,500.00); childcare/children's education costs ($100.00); clothing/laundry/dry cleaning ($150.00); personal care ($150.00); medical/dental ($325.00); transportation ($473.00); car insurance ($219.00); work lunches ($200.00); pet care ($145.00); and car tags ($10.00). [Trial Ex. 1 at pp. 45-46.]  Notably, when Mr. Warwick purchased the BMW in January 2024, their monthly payments on debts (including the new BMW, the Silverado, their mortgage, BHG, and American Express, but not including the numerous credit cards) totaled $6,029.74, which computes to nearly 78% of their net income and left only $1,722.09 for monthly expenses.  By contrast, the postpetition expenses claimed by Debtors net of the mortgage total $4,207.00.

objection) [Docs. 13, 32, 36, 38, 43, 44], Debtors proposed on September 30[22] to modify their

Plan by increasing by $50.00 their biweekly plan payment beginning October 21, 2024, and to

pay any net bonuses and all tax refunds into the plan. [Trial Ex. 3.]  The treatment for payment of

nonpriority unsecured creditors was proposed to be modified as follows:

> Unsecured creditors shall be paid pro rata on a funds available basis not less than a
> total $5,690.00 up to 100% to meet best interest requirements of 11 USC §
> 1325(a)(4); and Unsecured creditors shall be paid pro rata on a funds available basis
> not less than a total $17,826.80 up to 100% to meet Disposable income.  **Option
> providing the largest payment will be effective**.

[*Id*. (emphasis in original).]

The Trustee argued that the Chapter 13 Plan could not be confirmed because it did not

propose to pay all of Debtors' disposable income for the applicable commitment period, did not

meet the best interests test, and was not filed in good faith.[23] [Docs. 43, 53 at ¶ 6.]  As to

disposable income, the Trustee argued that Debtors' monthly disposable income under 11 U.S.C.

§ 1325(b)(2) was $463.78, requiring them to pay $27,826.80 to general unsecured creditors over

the life of the plan. [Doc. 43 at ¶ 3.]  Additionally, because Debtors filed their Chapter 13 case

within five months after purchasing the BMW and they were not paying 100% to their unsecured

creditors, the Trustee argued that Debtors did not operate in good faith through the filing of their

case or proposal of their Chapter 13 Plan. [*Id*. at ¶ 5; Doc. 53 at ¶ 6.]  No other party in interest

has objected to confirmation of the Chapter 13 Plan, and Debtors are current in their postpetition

plan payments. [Doc. 53 at ¶¶ 21, 22.]

---

[22] Notably, the Court raised the question of Debtors' good faith in retaining the BMW at the July 10, 2024 hearing on the Credit Union's motion for adequate protection payments on the BMW and Silverado.

[23] Based on the Joint Statement of Issues submitted by the parties on December 31, 2024 [Doc. 53 at p. 1], the Trustee has withdrawn the best-interests objection.

## II.  ANALYSIS

Courts must confirm a Chapter 13 plan that satisfies the requirements of 11 U.S.C. §
1325(a), which includes that "the plan has been proposed in good faith and not by any means
forbidden by law" and that "the action of the debtor in filing the petition was in good faith." 11
U.S.C. § 1325(a)(3), (7).  Each subsection addresses good faith temporally:  good faith in the
filing of the plan "considers the time period after filing a case," while the good-faith filing of the
case "evaluates the debtor's conduct as of the commencement of the case[.]" *In re Ames*, No. 21-
12125 ELF, 2022 WL 2195469, at *6 (Bankr. E.D. Pa. June 17, 2022).  Similarly "[§] 1325(a)(3)
tests the reasonableness of the plan and the sincerity of the debtor with respect to that particular
plan; § 1325(a)(7) tests whether the filing is fundamentally fair and in a manner that complies
with the spirit of the Code." *Id*. (quoting *In re Powers*, 554 B.R. 41, 59 (Bankr. N.D.N.Y. 2016)).

Bankruptcy courts in the Sixth Circuit perform the good faith analysis for both
subsections (a)(3) and (7) under an almost identical standard as cases concerning good faith and
dismissal under 11 U.S.C. § 1307(c). *In re Hall*, 346 B.R. 420, 426 (Bankr. W.D. Ky. 2006); *see
also In re Gomery*, 523 B.R. 773, 785 (Bankr. W.D. Mich. 2015) ("The factors that are relevant
to the good faith determination under either § 1325 or § 1307(c) obviously overlap to some
extent[.]" (citing *Alt v. United States (In re Alt)*, 305 F.3d 413, 419 (6th Cir. 2002); *Metro Emps.
Credit Union v. Okoreeh-Baah* (*In re Okoreeh-Baah*), 836 F.2d 1030, 1032-33 (6th Cir. 1988)).
The Trustee, as the objecting party, bore the initial burden of production to support her objection,
and Debtors bear the burden of proving by a preponderance of the evidence that their plan
satisfies all the requirements of § 1325(a), including that they have both proposed their plan and
filed their case in good faith. *In re Hager*, 572 B.R. 848, 851 (Bankr. W.D. Mich. 2017)
(citations omitted).

Whether a debtor has filed in bad faith requires examination of the totality of the circumstances and is based on past and present circumstances. *Soc'y Nat'l Bank v. Barrett (In re Barrett)*, 964 F.2d 588, 591 (6th Cir. 1992); *see also In re Gomery*, 523 B.R. at 784 ("The concept of good faith under both § 1325(a) and § 1307(c) is an "amorphous notion" that is both flexible and fact-specific."). "[T]the Court's evaluation of the Debtor's credibility is critical to a determination of the Debtor's sincerity and overall good faith. Moreover, the Court's evaluation of the Debtor's credibility will influence all its findings." *In re Anthony*, 664 B.R. 418, 435 (Bankr. S.D. Ohio 2024). In making the good faith determination under either subsection (a)(3) or (a)(7), courts generally focus on the following non-exhaustive factors:

> (1) the debtor's income; (2) the debtor's living expenses[;] (3) the debtor's attorney fees; (4) the expected duration of the Chapter 13 plan; (5) the sincerity with which the debtor has petitioned for relief under Chapter 13; (6) the debtor's potential for future earning; (7) any special circumstances the debtor may be subject to, such as unusually high medical expenses; (8) the frequency with which the debtor has sought relief before in bankruptcy; (9) the circumstances under which the debt was incurred; (10) the amount of payment offered by debtor as indicative of the debtor's sincerity to repay the debt; (11) the burden which administration would place on the trustee; and (12) the statutorily-mandated policy that bankruptcy provisions be construed liberally in favor of the debtor.

*In re Barrett*, 964 F.2d at 592 (citations omitted). Other factors include "the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt[,] . . . [and] whether any inaccuracies are an attempt to mislead the court," *Hardin v. Caldwell (In re Caldwell)*, 851 F.2d 852, 859 (6th Cir. 1988) (citation omitted). The Court also may consider

> the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.

*Alt*, 305 F.3d at 419 (citation omitted). Finally, the Court's analysis may include "a review of the sacrifices made by the Debtor[s], the pursuit of reasonable financial rigor, and efforts made

to address the claims of creditors." *In re Kash*, No. 19-20078 (JJT), 2020 WL 6811849, at *1
(Bankr. D. Conn. Nov. 16, 2020).

The factors "are relevant not as an end in themselves as part of a mechanical counting of
factors, but rather exist to guide the Court in its analysis of the 'key inquiry' – whether the debtor
is seeking to abuse the bankruptcy process." *In re Anthony*, 664 B.R. at 433 (quoting *Alt*, 305
F.3d at 419); *see also In re Gomery*, 523 B.R. at 785 ("[T]he 'same policy' of protecting against
'an abuse of the provisions, purpose or spirit' of chapter 13 is embodied in both evaluations [as
to good faith]."). Weighing the factors – "which 'may circumstantially reflect the debtor's
motivation, and ultimately his "good faith,"' in seeking relief under chapter 13" – assists courts
in determining whether "the debtor's purpose in filing for chapter 13 relief is consistent with the
underlying purpose and spirit of chapter 13 – i.e., financial 'rehabilitation through repayment of
debt' – [and if] the filing is likely in good faith." *Condon v. Brady (In re Condon)*, 358 B.R. 317,
326 (B.A.P. 6th Cir. 2007) (internal citations omitted).

Thus, the Court must make its determination based on a totality of the circumstances by
considering the applicable factors. Because many of the factors can more efficiently be
measured and discussed cumulatively, the Court has combined the relevant factors into three
categories and finds that each weighs against Debtors' good faith both in the filing of their case
and the filing of their plan so that confirmation will be denied.

### 1.    Category 1: Debtors' income, "reasonably necessary" expenses, and the sacrifice component of Chapter 13

"When a debtor seeks Chapter 13 relief, 'the entire family is affected by the sacrifices
and special efforts required by the Code. [A] family may not continue its prepetition lifestyle to
the detriment of creditors." *In re Bacon*, 449 B.R. 536, 541 (Bankr. E.D. Ark. 2011) (citations
omitted). As stated by one bankruptcy court:

> For a financially distressed debtor, . . . the benefits of chapter 13 bankruptcy relief are extraordinary, and include the ability to preserve assets by way of exemptions and extended payment of secured debts, a respite from creditors' collection efforts and litigation, and ultimately a discharge from financial burdens with a fresh start. But that relief comes with a price: [d]uring the term of a chapter 13 case, a debtor is expected to limit her expenditures to those that are reasonably necessary for her and her dependents' maintenance and support, and commit her disposable income—what's left after paying for those necessities—to the repayment of creditors. This quid pro quo is codified at 11 U.S.C. § 1325(b) for plan confirmation purposes. It is contrary to both the spirit and the letter of the Bankruptcy Code for a chapter 13 debtor to expend her income on non-essentials while paying only a small percentage to her creditors . . . .

*In re Emery*, No. 13-41769-JJR7, 2014 WL 6623948, at *3 (Bankr. N.D. Ala. Nov. 20, 2014) (finding that the debtor's and her husband's travel to Europe and California "were [likely] paid at the expense of her unsecured creditors").

Accordingly, "[d]ebtors should not continue prepetition, spendthrift lifestyles at the expense of their creditors." *In re Cesaretti*, No. 22-10454-nmc, 2023 WL 3676888, at *14 (Bankr. D. Nev. May 10, 2023). "[A]s a general rule, 'reasonably necessary' expenses as defined in chapter 13 cases means 'adequate' but not 'first class.' . . . If a debtor is not paying 100% of unsecured creditors' claims, then courts may require a debtor to forego the luxury expense." *In re Lindsey*, 243 B.R. 30, 32 (Bankr. E.D. Tenn. 1999) (citations omitted).

> Reasonably necessary expenses are unrelated to the debtor's former lifestyle. *Id.* As one court noted, the debtor "cannot expect to go 'first class' when 'coach' is available." *In re Kitson,* 65 B.R. 615, 622 (Bankr. E.D.N.C. 1986).
>
> . . . .
>
> The key term is "reasonable lifestyle." Debtors need not be reduced to poverty and granted, some discretionary or recreational spending is not inappropriate, but courts are loathe to favor kindly expenditures which are for luxury goods or serve to perpetuate a luxury lifestyle.

*In re McNichols*, 249 B.R. 160, 168, 171 (Bankr. N.D. Ill. 2000); *see also In re Trimarchi*, 421 B.R. 914, 923 (Bankr. N.D. Ill. 2010) (denying confirmation of the debtor's plan based on the debtor's $250.00 monthly expenditure to heat a swimming pool); *In re Navarro*, 83 B.R. 348,

355 (Bankr. E.D. Pa. 1988) ("The debtor's expenses should be scrutinized only for luxuries

which are not enjoyed by an average American family." (citation omitted)).[24]

> Even non-discretionary expenditures such as for food and shelter can reflect
> discretionary lifestyle choices. Thus a debtor whose monthly car payment exceeds
> that which is reasonably necessary is in reality making a discretionary expenditure
> to the extent of the excess. . . . The disposable-income test is designed to balance
> the interest of creditors with the interest of the debtor in obtaining a fresh start. Thus
> the proper methodology is to aggregate all expenses projected by the debtor which
> are somewhat more discretionary in nature, and any excessive amounts in the
> relatively nondiscretionary line items such as food, utilities, housing, and health
> expenses, to quantify a sum which, for lack of a better term, will be called
> "discretionary spending."
>
> The task before me, therefore, is to identify how much of the Debtors' anticipated
> expenses are discretionary in nature and to weigh them on this scale. If the
> discretionary expenses in the aggregate allow the Debtors to exceed their basic
> needs, including a reasonable reserve for recreation and exigencies (the reasonable
> "cushion"), then their plan cannot be confirmed.

*In re Gonzales*, 157 B.R. 604, 608-09 (Bankr. E.D. Mich. 1993) (footnote omitted).

As the analysis relates to expenses, the following guidelines have been adopted by

various courts "to protect the integrity of the Chapter 13 system":

> 1. **If there is a general rule, "reasonably necessary" means adequate but not
> first-class.** *See In re Easley,* 72 B.R. 948 (Bankr. M.D. Tenn. 1987); *In re Kitson,*
> 65 B.R. 615 (Bankr. E.D.N.C. 1986); *In re Tinneberg,* 59 B.R. 634 (Bankr.
> E.D.N.Y. 1986).

> 2. **Luxuries are excluded.** *See In re Tinneberg,* 59 B.R. 634 (Bankr. E.D.N.Y.
> 1986). *In re MacDonald,* 222 B.R. 69, 77 (Bankr. E.D. Pa. 1998); *In re Zaleski,*
> 216 B.R. 425, 432 (Bankr. D.N.D. 1997); *In re Cardillo,* 170 B.R. 490, 491 (Bankr.
> D.N.H. 1994).

> 3. A **convenience is not the same as a necessity.** *See In re Walsh,* 224 B.R. 231
> (Bankr. M.D. Ga. 1998).

> 4. **There is a sacrifice quotient in Chapter 13 cases.** Debtors who make the extra
> effort to provide a few more percentage points for the unsecured creditors are more

---

[24] *See also In re Roppo*, 442 B.R. 888, 896 (Bankr. N.D. Ill. 2010) (dismissing the case for abuse based on "a careful
review of the debtor's [excessive] expenses, most of which exceed the IRS Standards" and include rental of "a luxury
home" and "two luxury vehicles [a Mercedes R350 and Lincoln Aviator]").  Although *In re Ruppo* was a Chapter 7
case decided under the scope of 11 U.S.C. § 707(b)(3)(B), the analysis of expenses also applies when examining good
faith in a Chapter 13 case.

likely to survive a good-faith review. *See, e.g., In re Wilcox,* 251 B.R. 59, 68 (Bankr. E.D. Ark. 2000).

*In re McDonald*, No. 14-11740, 2015 WL 1524096, at *3 (Bankr. W.D. La. Mar. 27, 2015) (holding that "payment for a luxury item, with little or no payment to unsecured creditors, violates the good faith test in 11 U.S.C. § 1325(a)(3)" and denying confirmation of a plan that proposed to pay and retain a four-wheeler for five times the proposed distribution to unsecured creditors); *cf. Indus. Ins. Servs., Inc. v. Zick* (*In re Zick*), 931 F.2d 1124, 1129 (6th Cir. 1991) (determining that cases involving "excessive and continued expenditures [and] lavish lifestyle" are among the factors that could support dismissal of a Chapter 7 case for lack of good faith).

Post-BAPCPA, when debtors are "above median" under the means test, the Bankruptcy Code directs that "reasonably necessary" expenses are determined in accordance with 11 U.S.C. § 707(b)(2)(A) and (B). *See* 11 U.S.C. § 1325(b)(3).  These standardized expenses derive from the National and Local Standards as issued by the Internal Revenue Service and are calculated on Official Form 122C-2 Chapter 13 Calculation of Disposable Income, and their use supports the "adequate but not first class" notion.[25]  Nevertheless, even if a debtor satisfies the mechanical requirements of § 1325(b), good faith remains an issue. *See, e.g., In re Hicks*, No. 10-41855-JJR-13, 2011 WL 2414419, at *7 (Bankr. N.D. Ala. June 15, 2011) (denying confirmation for lack of good faith when debtors included a security alarm, cable, unsubstantiated classroom expenses, and payment for a Cadillac and Harley-Davidson motorcycle even though they owned a truck and van that were paid for and "[their] financial distress was the result of their imprudent and excessive use of credit").  Notably, one purpose of BAPCPA was "to deter debtors from 'loading

---

[25] "Applied correctly, [the disposable income text in § 1325(b)] prohibits confirmation of a plan that pays for luxury items, investments and other unreasonable or not necessary expenses." Keith M. Lundin, *Lundin On Chapter 13*, § 108.4 at ¶ [1], LundinOnChapter13.com (last visited Mar. 21, 2025). Before enactment of BAPCPA, courts struggled with the determination of disposable income and determining the reasonableness of expenses. *See, e.g., In re Kitson*, 65 B.R. at 618-21 (providing a detailed discussion of the "considerable debate concerning the degree to which bankruptcy judges in applying § 1325(b)(1)(B) should make judgments that impose limits on a debtor's lifestyle"). Without exception, however, courts find that luxury goods or services are not reasonably necessary.

up' on new debt in contemplation of a bankruptcy filing." *In re Page*, 658 B.R. 178, 192 (Bankr. E.D. Wash. 2024) (citing *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 240-41 (2010)).

Debtors argue that they filed their case in good faith because they have not previously filed for bankruptcy, live in a 1,500 square foot home, are hardworking, and "are not extravagant people." Mr. Warwick testified that part of the couple's financial woes stem from the failure of his company to pay profit-sharing bonuses in 2024 that he was accustomed to receiving. Additionally, Mrs. Warwick testified at trial that Debtors have "tightened their belts" as to their expenses since filing their case, including that their daughter had to give up her weekly ice skating lessons and gymnastics as well as her eighth grade trip. These self-serving averments notwithstanding, Debtors have proposed a plan that seeks to rid themselves of their extensive unsecured debts while maintaining the lifestyle to which they have grown accustomed, especially concerning their vehicles and vacations.

Further, the Court finds incredible Mr. Warwick's testimony that Debtors' financial difficulties leading to the bankruptcy filing centered around the change to Mr. Warwick's bonus structure. For example, Mr. Warwick testified that his past salary has included profit-sharing and performance bonuses, such as the $22,000.00 profit-sharing bonus he received in 2023, and that he began to hear "chatter" in February 2024 that the profit-sharing bonuses might not be paid. As it turns out, Mr. Warwick, in fact, did not receive a profit-sharing bonus in 2024, but he did receive a $7,080.00 performance bonus in March 2024. More significantly, however, Debtors each testified at trial that their $7,751.83 combined monthly income as reflected on Schedule I was correct,[26] but this information is contradicted by their near-year-end payroll stubs

---

[26] Mr. Warwick testified that he has received a $5,000.00 raise that will go into effect in April.

for 2024, which reflect an annual net income of $103,614.89,[27] which equates in monthly net income of $8,634.57 when divided by twelve months. [*Compare* Trial Ex. 1 at pp. 43-44 *with* Trial Ex. 12 at pp. 2, 4.]  Most importantly, the record as a whole reflects that Debtors engaged in a pattern and practice of incurring debt to pay off other debt to maintain a lifestyle that could not be sustained by their income alone, resulting in escalating debt that they could not pay, regardless of whether Mr. Warwick would have received a 2024 bonus commiserate with what he received in 2023.

The Court also is unpersuaded that Debtors' expenses are reasonably necessary and evidence sacrifice for the benefit of their creditors.  The most glaring evidence in support of such a conclusion is Debtors' desire to retain a nearly new BMW with a monthly payment of $1,045.18.[28]  Such would be to the detriment of Debtors' unsecured creditors, which are proposed to receive a pro rata distribution of no less than $27,826.80, equating to a dividend of as little as 15%.[29] [*See* Trial Ex. 2 at p. 2; Trial Ex. 3.]

The Court finds insufficient Debtors' explanation of the decision – little more than one month before seeking advice from bankruptcy counsel – to forego purchase of the Lexus, a three-year old luxury vehicle that Mrs. Warwick had driven only 36,000 miles since it was leased when new.  The Lexus could have been retained at a price of $23,076.90, with monthly payments nearly the same as the lease payment had been. [*See* Trial Ex. 5 at p. 1.] Instead of paying for the Lexus at $491.00 monthly for a gross capitalized cost of $47,163.28, Mr. Warwick purchased the

---

[27] Mr. Warwick's 2024 net wages were $92,571.94, and Mrs. Warwick's net wages through December 18, 2024, were $11,042.95. [Trial Ex. 12 at pp. 2, 4.]  The Court assumes that Mrs. Warwick received no additional wages in December 2024 given her job at the school.  Mr. Warwick's net annual wages were computed by adding to Mr. Warwick's year-to-date net pay shown on his penultimate pay stub for 2024 the net pay he received on December 19, 2024 (i.e., $89,395.23 plus $3,179.71 = $92,571.94).

[28] Debtors' mortgage is $1,594.75, which is secured by their home valued at $310,000.00, is only $549.57 higher than the monthly payment for the BMW, which is valued at $68,000.00. [*See* Trial Ex. 1 at pp. 20-21, 29-30.]

[29] The claims register reflects unsecured claims filed totaling $184,082.80.

BMW, downplaying it at trial as "a low-end model SUV," by incurring a monthly payment of more than twice what the Lexus purchase would have cost when measured by either a monthly payment or the gross capitalized cost (i.e., $1,045.18 monthly and $100,395.84 total payments). The difference between the Lexus and BMW monthly payments for the sixty-month life of the plan computes to a loss of $33,250.80 to unsecured creditors – more than double the minimum amount proposed to be paid to them.[30]

Mr. Warwick admitted at trial that he did not visit any other dealerships nor did he attempt to find a different type of vehicle to replace the Lexus. He also testified that his intention was to find a vehicle that was "on par" with what Mrs. Warwick was used to driving. When questioned as to why he did not visit any other dealerships, Mr. Warwick was unable to provide an answer and conceded that he could have found a different, less expensive vehicle if he had shopped around. He also acknowledged that the BMW is costly to maintain and already needs new tires. When asked how Debtors, at the time of purchase, anticipated paying for the BMW when they were already paying more than $5,000.00 monthly for their mortgage, the Silverado, the BHG loan, and various credit cards, Mr. Warwick testified that he had anticipated making extra money throughout the year through his bonuses, notwithstanding that the largest one he had received netted only $15,969.45 in March 2023. He also testified, not surprisingly, that he had thought about borrowing more money to service his outstanding debt obligations. As stated by the Bankruptcy Court for the Eastern District of Washington, "[t]hese debtors made a choice to 'load up' on acquiring . . . vehicles with debt financing shortly before filing for bankruptcy and should bear the economic consequences of their choice rather than shifting the costs to their unsecured creditors." *In re Page*, 658 B.R. at 193.

---

[30] Even if Debtors' vehicle expense was the amount stated in the IRS Guidelines – $619.00 – Debtors could pay an additional $25,570.80 to unsecured creditors over the life of the plan, increasing the dividend from a minimum of 15% to a minimum of 29%.

As it relates to their discretionary travel, Mr. Warwick first testified that the family routinely took a one-week vacation each year but later acknowledged that in 2023, the family took three vacations: to Disney World, Yellowstone National Park, and New York City. The record also reflects that Debtors and their daughter vacationed twice in 2024: to Orange Beach, Alabama and New Orleans, Louisiana in March (prepetition) and a one-week trip to Munich, Germany in June 2024 (postpetition).

The Court finds incredible Debtors' testimony that the trip charged to the Marriott Card in March was primarily to visit Mrs. Warwick's terminally ill grandmother in Birmingham, Alabama. Mrs. Warwick attempted to explain that she and the couple's daughter had visited her grandmother earlier in 2024, but that her grandmother had not recognized them, so when they went to visit again in March 2024, Mr. Warwick had surprised Mrs. Warwick with the beach and New Orleans trip "to get her mind off things." She testified that Mr. Warwick made all of the arrangements for the trip and explained that there were no credit card charges from Birmingham because they had dined with her aunt and uncle without incurring any debt. The credit card statements reflect that the March 2024 trip (which was planned early in March, less than one month after Debtors had consulted with bankruptcy counsel) maxed out the Marriott Card and was not done with any budget restrictions in mind.

Concerning the trip to Munich, Mr. Warwick also testified that he and Mrs. Warwick had booked it through United Vacation at the end of 2023, to celebrate their thirty-year anniversary. Debtors financed the entire trip, $5,886.00, through Uplift but never made any payments. [*See* Trial Ex. 1 at p. 38.] He explained that once it was financed, it was considered "pre-paid" and there were no options for cancellation or a refund. Mr. Warwick also acknowledged that they spent an additional $2,000.00 on that trip, with Mrs. Warwick testifying that those funds had come from their savings.

Examination of the Marriott Card statements establishes that Debtors charged at least
$3,763.41 attributable to the trip to Orange Beach and New Orleans. [*See* Trial Ex. 9 at p. 2.]
Adding that amount to the $5,886.00 "pre-loaned" amount for the Munich trip, Debtors incurred
debts of $9,651.41 for luxury trips within a few months of seeking bankruptcy protection.  Then,
to make matters worse, they spent an additional $2,000.00 postpetition during their Munich trip.

Finally, although the majority of the expenses listed in Debtors' Schedule J are
reasonable for a family of three, there are four categories that appear to be excessive:  (a) an
aggregate food budget of $1,700.00 per month (including the line item for "work lunches"); (b) a
monthly clothing budget of $150.00, which translates to $1,800.00 annually, even though they
scheduled their clothing jointly at a value of $400.00; (c) a monthly budget of $150.00 (i.e.,
$1,800.00 annually) for personal care products and services; and (d) pet expenses for one dog of
$145.00 monthly ($1,740.00 annually).[31] [*See* Trial Ex. 1 at pp. 22, 46.]  Additionally, Mrs.
Warwick testified that they had cut expenses for their teenaged daughter's ice skating and
gymnastic lessons as well as for her eighth-grade trip; however, Schedule J reflects monthly
payments of $100.00 (equating to $1,200.00 per year) for unexplained "childcare and children's
education costs."  Although the Court is sympathetic to the sacrifice borne by Debtors' daughter,
that fault falls squarely on the shoulders of Debtors' financial decisions, including their desire to
keep the BMW with its $1,045.18 monthly payment when, even postpetition, they could have
surrendered the BMW for a vehicle with a lower monthly payment.

---

[31] Because Debtors' income is above-median under the means test as reflected in their Chapter 13 Statement of Current
Monthly Income and Calculation of Commitment Period (Official Form 122C-1), they were required to complete
Official Form 122C-2 for the calculation of their disposable income. [Doc. 5 at pp. 1, 3, 5-11.]  As reflected in the
Form 122C-2, allowable expenses for Debtors' food, clothing, and other items are limited to $1,735.00 [*see id.* at ¶¶
6, 30], but Debtors claim $1,950.00 in expenses for food, clothing, personal care products and services, and work
lunches [Trial Ex. 1 at p. 46].  Thus, although the Court need not reach the disposable-income objection of the Trustee,
Debtors clearly do not meet the disposable-income requirements for confirmation of a Chapter 13 Plan.

2.    **Category 2: the nature of the debts, the circumstances under which the debts were incurred, and Debtors' treatment of creditors both before and after the petition was filed, including the percentage repayment of unsecured debts**

"The Bankruptcy Code contemplates that Chapter 13 can and should be available to those whose prepetition misdeeds are the source of their current financial problems. . . . [In fact,] '[a] Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct *where other factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims*.'" *In re Colston*, 539 B.R. 738, 748-49 (Bankr. W.D. Va. 2015) (quoting *Neufeld v. Freeman*, 794 F.2d 149, 153 (4th Cir. 1986) (emphasis added)). Nevertheless, even if a plan passes muster under § 1325(a)(3), because "the heart of the inquiry is 'whether the filing is fundamentally fair to creditors and, more generally, is fundamentally fair in a manner that complies with the Bankruptcy Code,'" the petition may not have been filed in good faith as required by § 1325(a)(7), which includes an analysis of pre- and postpetition conduct, the nature of the debts and how they arose, and how the debtor's actions have affected creditors. *Id*. (quoting *In re Dickenson*, 517 B.R. 622, 637 (Bankr. W.D. Va. 2014)). Accordingly, "[t]he proposed percentage to be paid on unsecured creditors' claims is a factor in determining whether the debtor has proposed a plan in good faith." *In re Ollis*, 625 B.R. 308, 313 (Bankr. D.S.C. 2021). Here, the record weighs against a finding that Debtors filed this case and their plan in good faith based on the nature of their debts, the way in which the debts were incurred, and how they have treated their creditors both pre- and postpetition, including the minimal dividend proposed to unsecured creditors.

Debtors' secured debt as of the petition date, per Schedule D, totaled $308,196.00, consisting of $71,671.00 for the BMW, $10,966.00 for the Silverado, and $225,559.00 for their mortgage. [Trial Ex. 1. at pp. 29-30.] Based on the claims filed by Wells Fargo Bank, N.A. and the Credit Union, the secured debts actually total $306,751.43: $224,496.00 on the mortgage,

which was refinanced in May 2023 with Debtors cashing out equity of more than $65,000.00

[Claim No. 3-1]; $10,956.26 on the Silverado purchased nearly new in May 2020 for $34,370.62

[Claim No. 5-1]; and $71.299.17 on the BMW [Claim No. 6-1].  The fair market value of the

property securing the home and the Silverado exceeds the debt; however, the fair market value of

the BMW is $68,000.00, which leaves the Credit Union under-secured for more than $3,000.00.

[*see* Trial Ex. 1 at pp. 29-30; Claim No. 6-1.]

Debtors have no unsecured priority debt. and they scheduled unsecured nonpriority debt

in the amount of $196,358.00, for which claims totaling $183,772.72 have been filed (excluding

one medical debt), as follows:

| CREDITOR | TYPE OF DEBT | RELEVANT DATES | OBLIGOR | SCHEDULED AMOUNT | PROOF OF CLAIM AMOUNT |
|---|---|---|---|---|---|
| American Express Travel Services | credit card #1493 | opened 2/23 last active 5/7/24 | Mr. Warwick | $29,392.00 | $29,392.39 |
| American Express Travel Services | credit card #4973 | opened 9/23 last active 5/2/24 | Mrs. Warwick | $9,622.00 | $9,622.58 |
| Bank of America | credit card #9133 | opened 8/22 last active 4/24 | Mr. Warwick | $8,651.00 | $8,693.49 |
| Bankers Healthcare Group | flex loan | incurred 2023 | Mr. Warwick | $68,828.00 | $73,039.47 |
| Barclays Bank Delaware | credit card #8649 | opened 1/17 last active 4/24 | Mr. Warwick | $3,555.00 | $3,555.02 |
| Capital One Bank | credit card #4366 | opened 6/7/18 last active 5/24 | Mr. Warwick | $5,191.00 | $5,191.12 |
| Chase Card Services | credit card #8327 | opened 8/18 last active 4/24 | Mrs. Warwick | $19,744.00 | $19,744.08 |
| Chase Card Services | credit card #6374 | opened 2/14 last active 4/24 | Joint | $9,470.00 | $9,470.28 |
| Chase Card Services | credit card #6844 | opened 7/2018 last active 5/2024 | Mr. Warwick | $5,125.00 | $5,125.93 |
| Citibank/Best Buy | charge account #9502 | opened 12/2008 last active 4/2024 | Mr. Warwick | $3,096.00 | $3,125.30 |
| Costco Citi Card | credit card #6329 | opened 9/22 last active 2/24 | Mr. Warwick | $10,115.00 | $10,115.42 |
| Goldman Sachs Bank USA | credit card #4070 | opened 10/19 last active 4/29/24 | Mr. Warwick | $4,974.00 | not filed |
| Service Finance Company | credit card #3979 | opened 7/22 last active 4/24 | Mr. Warwick | $5,991.00 | not filed |
| Solutions Finance | note loan | opened 11/15/18 last active 1/11/19 | Mrs. Warwick | unknown | not filed |
| Synchrony Bank/ Care Credit | credit card #8211 | opened 1/2021 last active 3/2024 | Mr. Warwick | $2,381.00 | $2,381.47 |

| Uplift/cb | unsecured[32] | opened 1/22/2024 last active 3/19/2024 | Mr. Warwick | $5,886.00 | not filed |
| Wells Fargo Bank NA | credit card #6984 | opened 7/2018 last active 4/2024 | Mr. Warwick | $4,337.00 | $4,316.17 |

[Trial Ex. 1 at pp. 32-40; Claim Nos. 1-1, 4-1, 7-1 through 15-1, 17-1, 18-1.[33]]

With the exception of the debt for a "note loan" with Solutions Finance, which was scheduled as last active in 2019; the American Express debts; the BHG debt, proceeds of which were used to pay down credit card debt in January 2023; the Uplift vacation loan, which was incurred in January 2024; and the sole medical debt of $310.08, the remainder of Debtors' scheduled, unsecured nonpriority debt is credit card debt totaling more than $88,000.00, for which claims have been filed totaling $71,718.28. Further, based on the dates the accounts were last active and as evidenced in the credit card statements in the record and Debtors' Schedule E/F, the overwhelming majority of the unsecured debt was incurred in the two years preceding the petition date. Moreover, Debtors were actively incurring credit card debt in the ninety days preceding their bankruptcy case. [See Trial Ex. 1 at pp. 32-40; Trial Ex. 9; Trial Ex. 10 at pp. 21-28.]

In *In re Fretwell*, 281 B.R. 745 (Bankr. M.D. Fla. 2002), a case with similar facts, the court found that the debtors had not filed their plan in good faith and denied confirmation. In addition to constructing a home, the debtors "drew $39,350.00 in cash advances from credit cards, which they deposited into their . . . checking account . . . [and] also charged $66,108.42 on their credit cards for purchases, balance transfers, and credit card convenience checks," of which the court found that $24,258.46 represented balance transfers. *Id*. at 748. While they "charged well over $100,000.00 on their credit cards," their annual income totaled $59,199.20, which

---

[32] Schedule E/F does not clarify, but per Mr. Warwick's testimony, this debt relates to the family's postpetition trip to Germany in June 2024. The creditor did not file a proof of claim.

[33] An unsecured claim also was filed by SE Emergency Physicians LLC for $310.08. [Claim No. 16-1.]

included $39,371.00 in wages, $11,112.00 in social security benefits, and $8,716.20 in pension

benefits. *Id*. Early the next year (2000), however, both of the debtors lost their jobs. *Id*.

Nevertheless, the debtors drew cash advances of $48,000.00 and charged $17,041.25 on their

credit cards (of which $8,085.45 represented balance transfers). *Id*. at 749.  In March 2000, the

debtors took a trip to Las Vegas for their daughter's wedding, for which they "charged more than

$800.00 in trip expenses, including a $563.95 helicopter ride, on their . . . credit card." *Id*.  After

taking out a $5,000.00 cash advance from a credit card at the end of September, the debtors

traveled to Colorado, Wyoming, Montana, Idaho, Oregon, California, Nevada, and Utah in

October and November 2000, charging an additional $3,000.00 on credit cards during their trip.

*Id*.  The debtors stopped making payments in January 2001, before filing their case in February

2001, at which time they owed credit card debt exceeding $187,000.00. *Id*.  At all times,

however, the debtors remained current on their mortgage payments. *Id*. at 752.

The bankruptcy court denied confirmation of the debtors' plan primarily based on the

circumstances under which their debts arose, which the court called "troubling." *Id*. at 751.  In

addition to ignoring their bankruptcy attorneys' pre-filing advice, which included constructing a

new home "with the proceeds of their mostly non-exempt liquidated assets as well as almost

$25,000.00 in credit card charges," the court based its determination on the large amounts drawn

from their credit cards as cash advances that they deposited into their bank accounts but did not

use to make significant payments on the credit card debts in conjunction with incurring

additional credit card debt. *Id*.  Specifically, the court recounted the following:

> The circumstances under which Debtors contracted their debts are troubling. After
> meeting with Mr. Roy in early 1999, Debtors disregarded Mr. Roy's advice to
> finance a home. Instead they elected to fund the construction of a home with the
> proceeds of their mostly non-exempt liquidated assets as well as almost $25,000.00
> in credit card charges. Additionally, Debtors drew almost $40,000.00 in cash
> advances on their credit cards which they deposited directly into their checking
> account. Of that, they paid only $12,000.00 toward their credit cards. Moreover,
> Debtors incurred an additional $66,000.00 of credit card debt, of which only

$24,000.00 represented balance transfers. Mrs. Fretwell's testimony that Debtors expected to maintain their financial obligations as long as they were able to sell or rent their old house and maintain their jobs is preposterous. If Debtors had sold their large home, they would have reduced their expenses by approximately $22,000.00 annually. During 1999, Debtors' cash withdrawals alone, not including balance transfers and purchases, exceeded their housing expenses by almost $18,000.00. Debtors' profligate spending is even more troubling in light of the fact that it occurred after Debtors consulted a bankruptcy attorney because of their concern about health and financial problems. Debtors knew their continued employment was questionable. They also knew they could not pay back their credit cards if they were not employed.

Recognizing the potential consequences of Debtors' conduct, Mr. Roy advised Debtors during their February 10, 2000 meeting to compile a list of the source of the funds used to pay for their newly constructed house and that it would not be a good idea to file bankruptcy at that time. Debtors took affirmative steps to stave off collection efforts during the filing "moratorium" by making their credit card payments with cash advances from other credit cards. To that end, they drew $48,000.00 in cash advances and paid $35,000.00 toward their credit cards. Additionally, Debtors continued making their $1,637.00 monthly mortgage payments. Despite their intent to file bankruptcy once the "moratorium" was lifted, Debtors continued making purchases on their credit cards, spending over $4,000.00 on vacations alone.

*Id*. at 751-52.  The court also found that the debtors "were not sincere in seeking Chapter 13 relief" and that they filed their case "not in a sincere effort to repay their creditors but rather to avoid dischargeability issues that may have arisen in a Chapter 7 case" because there was a likelihood that "some, if not all of the credit card debt" would be nondischargeable under 11 U.S.C. § 523(a)(2). *Id*. at 752.

Here, as noted, the claims register reflects unsecured claims filed in the total amount of $183,772.72, of which more than $165,000.00 was incurred within two years of the petition date.[34]  In the two years preceding the petition filing, Debtors[35] incurred unsecured credit card

---

[34] Debtors scheduled an additional $11,877.00 in unsecured debt for which proofs of claim were not filed, and they acknowledged in Schedule E/F that such debt was incurred since July 2022. [*See* Trial Ex. 1 at pp. 37-38 (identified as creditors "Service Finance" and "Uplft/cb").]

[35] Although Mr. Warwick is the sole obligor on much of the credit card debt and the BHG loan, the BHG proceeds were deposited into Debtors' joint bank account and used by both he and Mrs. Warwick, and he testified that Mrs. Warwick had authority to use his credit cards, for which the majority of the charges were for dining out and to retail establishments.

and loan debt of more than $121,000.00 while they increased their secured debt by more than

$115,000.00.[36]  While they used some loan funds to pay off older unsecured debt, Debtors did

not curb their spending.  Thus, rather than paying off old debt as Mr. Warwick testified, Debtors

simply incurred new (and more) unsecured debt in place of the old.  As reflected in their

Affidavit Regarding Use of Money, Debtors received the $74,961.09 BHG loan proceeds on

January 4, 2023, and during that month, paid off an American Express loan and a Wells Fargo

loan and paid down two Chase credit cards and the Best Buy card. [Trial Ex. 7.]  Nevertheless,

between February and March 2023, after paying off the American Express loan, $40,000.00 from

American Express was deposited into their account [*see* Trial Ex. 8 at p. 3], and when they

sought bankruptcy protection sixteen months later, there were balances on the Chase and Best

Buy credit cards and aggregate debt to American Express of more than $39,000.00. [*See* Trial

Ex. 1 at pp. 33-36.]  Additionally, Mr. Warwick testified that after he heard "chatter" in February

2024 that the profit-sharing bonuses might not be paid, he contacted Mayer & Newton to discuss

filing a bankruptcy case.  Mr. Warwick then proceeded to max-out the Marriott Card for the

vacation to Orange Beach and New Orleans.

        The Court also finds questionable the nature of and circumstances surrounding the BHG

loan.  Mr. Warwick testified that he received a solicitation either through the mail or via email

from BHG and took out the loan to pay off debts.  He acknowledged that he did not research

BHG before applying for the loan, he was unaware that it was a business loan, and he is not a

sole proprietor.  He stated that he may have spoken with someone over the phone once, but

otherwise, the transaction was done via email, and he used DocuSign to apply for the loan and

sign all BHG documents.  Notwithstanding Mr. Warwick's contention that he did not understand

---

[36] Debtors received $65,375.11 in cash when they refinanced their home mortgage, and they increased their vehicle-related debt by the financed cost of the BMW ($73,224.25) when they could have purchased the Lexus for $23,078.90 (i.e., $73,224.25 less $23,078.90 plus $65,375.11 = $115,520.46).

that the BHG loan was a business loan, both the BHG Application and the Settlement Statement and Disbursement Acknowledgement very clearly reflect the applicant and debtor as "Gary L. Warwick d/b/a Gary L. Warwick, Sole Proprietor" and bear his signature. [Trial Ex. 6 at pp. 1-2.] The BHG Application begins with an informational block entitled "PRACTICE/BUSINESS INFORMATION" with line items entitled "Full Legal Name of Practice/Business"; "Business Structure Type"; Physical Address (No P.O. Box)"; "Business Phone"; "Business Fax"; Date Established"; and "Fed. ID #." [Trial Ex. 6 at p. 1.] The second informational block is entitled "APPLICANT INFORMATION" and includes line item titles such as "Specialty"; "License State"; "Ownership %"; "Have you ever had any disciplinary actions on your healthcare license?" [*Id*.] The third informational block is entitled "ADDITIONAL GUARANTOR" and includes the same line items as the previous block (with no information completed). [*Id*.] The fourth informational block entitled "USE OF FUNDS" includes two line items: "Primary use of funds"; and "Amount needed." [*Id*.] Finally, the fifth information block is entitled "ADDITIONAL BUSINESS INFORMATION" with line items of "Home based business?" and "Prior year gross sales." [*Id*.] Even if Mr. Warwick was not presented with this specific form and instead was required to input information into a questionnaire from which the BHG Application was later created, the nature of the informational block titles and line-item queries unquestionably indicate that the loan was for a business, and Mr. Warwick signed the BHG Application.

Besides, the answers to specific questions on the BHG Application indicate that Mr. Warwick understood the business nature of the loan for which he was applying as reflected by the following examples:

| LINE ITEM QUESTION | RESPONSE |
|---|---|
| **Full Legal Name of Practice/Business** | Gary L. Warwick d/b/a Gary L. Warwick, Sole Proprietor |
| **Business Structure Type** | Sole Proprietorship |

| Date Established | 03/01/2000 |
|---|---|
| Fed. ID # | xxx-xx-1730[37] |
| Specialty | Non-Healthcare |
| Ownership % | 100 |
| Have you ever had any disciplinary actions on your healthcare license? | No |
| Primary use of funds | Business Development |
| Prior year gross sales | $0.00 |

[*Id.*]  The "Financing Agreement Sole Proprietorship Promissory Note/Security

Agreement/Personal Guaranty" – also signed by Mr. Warwick – reflects that he was signing as

"Owner" of Gary L. Warwick d/b/a Gary L Warwick, Sole Proprietor and was providing a

personal guaranty [Claim No. 4-1 at pp. 5-9.]

The BMW purchase discussed in detail above also serves as an example of how Debtors

treated creditors prepetition and how their decisions postpetition continue to disadvantage their

unsecured creditors.  Simply, Mr. Warwick did not explain why he did not merely decline the

Lexus salesman's pressure to buy a more expensive vehicle when he could have purchased the

Lexus with only 36,000 miles for $23,076.90.  He did not explain why he chose, instead, to

purchase the much more expensive BMW at another dealership, trading in the Lexus for a credit

of only $2,669.00 and incurring debt of more than $73,000.00.  Moreover, Debtors have not

offered to amend their plan to surrender the BMW in exchange for finding a less costly vehicle

that would allow for a greater payment to their creditors, especially considering that they

incurred, at a minimum, credit card debt of $14,596.21 on the Marriott and Disney Cards after

they purchased the BMW. [Trial Ex. 9; Trial Ex. 10 at pp. 17-28.]

> **3.    Category 3:  the timing of the petition, the sincerity with which Debtors have petitioned for Chapter 13 relief, the amount of payment offered as indicative of their sincerity, the pursuit of reasonable financial rigor, and whether they are attempting to abuse the spirit of the Bankruptcy Code**

---

[37] The BHG Application reflects Mr. Warwick's full social security number which has been redacted here in compliance with the requirements of Federal Rule of Bankruptcy Procedure 9037(a)(1).

"'Good faith' requires honesty of intention in the debtor's conduct in the submission, approval and implementation of their plan. It requires a determination by the Court that the debtors have not misrepresented facts in their plan, unfairly manipulated the Bankruptcy Code or otherwise proposed their Plan in an inequitable manner." *In re Ollis*, 625 B.R. at 313 (citations omitted). As summarized by the Sixth Circuit,

> Good faith is an amorphous notion, largely defined by factual inquiry. In a good faith analysis, the infinite variety of factors facing any particular debtor must be weighed carefully. We cannot here promulgate any precise formulae or measurements to be deployed in a mechanical good faith equation. The bankruptcy court must ultimately determine whether the debtor's plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13: a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources. The decision should be left simply to the bankruptcy court's common sense and judgment.

*In re Okoreeh-Baah*, 836 F.2d at 1033. In other words, "a debtor's motive in seeking chapter 13 relief is 'not only an appropriate factor to consider when evaluating a debtor's good faith in seeking relief under chapter 13, it is *essentially the heart of the good faith inquiry*.'" *In re Anthony*, 664 B.R. at 432 (quoting *In re Condon*, 358 B.R. at 329 (emphasis added)).

Illustrative of the good-faith analysis, one bankruptcy court denied confirmation of the debtor's plan that proposed "to pay approximately $39,050 to unsecured creditors, whose claims total an estimated $127,000." *In re Kash*, 2020 WL 6811849, at *1 n.1. The court first observed that "the Debtor and her husband have lived at the extreme end of their financial means pre-petition and now seek to maintain a fairly commensurate lifestyle that their present income cannot support." *Id*. at *2. In addition to maintaining an expensive mortgage on a home that was valued at significantly less than the mortgage, the debtor's prepetition monthly expenses included $665.12 for a Porsche, $527.00 for a golf membership, an average of $998.00 for dining out, and $659.00 for a loan incurred mere months before the bankruptcy to install a pool. *Id*. The court was dissatisfied with the debtor's incremental attempts to raise the dividend to unsecured

creditors, which occurred only after the trustee had objected, stating that it was "not convinced . .

. that the Debtor has proposed the 'fundamentally fair' treatment of her creditors," and it was

"clear that the Debtor is attempting to maintain a luxurious lifestyle to the detriment of her

unsecured creditors." *Id*. The court concluded by holding that "[t]he degree to which [the

debtor's] creditors would be made whole and the amount of disposable income allocated to the

Plan do not evidence the Debtor's sincerity or proper motivations in seeking Chapter 13 relief."

*Id*.

Here, Debtors initially proposed a sixty-month plan with $900.00 biweekly payments and

tax refunds exceeding $1,500.00. [Trial Ex. 2 at pp. 1-2.]  After the Court questioned Debtors'

good faith and after the Trustee raised issues at numerous continued meetings of creditors,

Debtors proposed to increase the biweekly plan payments to $950.00 beginning in late October,

to commit all tax refunds to the plan, and to commit all net bonuses to the plan. [Trial Ex. 3.]

These proposed payments of income into the plan, however, do not overcome Debtors' pre- and

postpetition conduct with respect to the filing of the case and the sincerity of their attempt to

repay creditors. Instead, Debtors' pre- and postpetition treatment of creditors, including their

choice to retain the BMW, weigh against a finding of good faith.  Also relevant to the Court's

good-faith analysis is Debtors' problematic testimony about the nature of the BHG loan and the

March 2024 trip to the beach and New Orleans after they sought advice about bankruptcy.

Debtors' testimony about the March 2024 trip was especially troubling because of the initial

untrue characterization of the trip as merely a visit to Birmingham to see Mrs. Warwick's dying

grandmother.  Their testimony was fully forthcoming only after detailed questioning by the

Trustee and the Court with reference to the Marriott Card statements.  Indeed, Mr. Warwick's

attitude throughout his testimony was blasé, specifically when he was questioned about when

Debtors last made payments to creditors in relation to when they met with their attorneys and

filed the case and about how Debtors had routinely incurred additional debt while "paying off" old debts, as well as his testimony about the purchase and retention of the BMW.

Last, but not least, the Court concludes that Debtors' motivation for filing this case was not in good faith. It is clear to the Court that they filed this Chapter 13 case to rid themselves of nearly $200,000.00 in unsecured debt that they incurred to live a lifestyle that was well beyond their means. Taking together Debtors' choices (1) to incur (and keep) a car payment of more than $1,000.00 for a late-model luxury vehicle, (2) take trips to the beach and New Orleans shortly before filing this case, (3) take a trip to Germany postpetition (spending additional funds over what was financed less than six months prepetition), and (4) continue to use credit cards until as late April 2024 [Claim No. 8-1 at p. 7], all while proposing to pay pennies on the dollar on more than $165,000.00 of unsecured debt that was incurred in the two years before they sought bankruptcy relief, the Court finds that Debtors did not propose their plan or file their case in the spirit of the Bankruptcy Code, which exists for "the honest but unfortunate debtor[s]" to obtain a fresh start. *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).

### III. CONCLUSION

In the end, although it may be that Debtors, as they argued, "are not extravagant people" and live in a relatively small home, they nevertheless have lived extravagantly and well beyond their means to the detriment of their creditors. The Court finds that Debtors have not met their burden to show that they filed their case or proposed their Chapter 13 plan in good faith so that confirmation will be denied. *See* 11 U.S.C. § 1307(c)(5).

Further, because the defects in Debtors' filing of this case without good faith cannot be cured or remedied by filing an amended plan, this Chapter 13 bankruptcy case will be dismissed. *See In re Brandland*, 570 B.R. 203, 219 (Bankr. E.D. Va. 2017); *In re Colston*, 539 B.R. 738, 750 (Bankr. W.D. Va. 2015) ("Under [§] 1325(a)(7), 'if a lack of good faith in filing a chapter 13

petition mandates a denial of confirmation, it would appear that this defect would be

irremediable,' and '[i]f so, a chapter 13 case in which the debtor is unable to confirm any plan

warrants dismissal under [§] 1307(c).'").

FILED:  March 26, 2025

BY THE COURT

*s/ Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE